UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Crim. No. 3:14-cr-227 (AWT) |
| v. | : | |
| EARL O'GARRO, JR. | : | |

### ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

For the reasons set forth below, the defendant's Emergency Motion for Reduction in Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 185) is hereby DENIED.

The defendant was charged in a Second Superseding Indictment with two counts of wire fraud and one count of mail fraud. On December 14, 2015, the jury convicted the defendant on all three counts following a four-day trial. The presentence report calculated the defendant's total offense level as 29 and determined that the defendant fell within Criminal History Category II. Consequently, the advisory range under the Sentencing Guidelines was 97 to 121 months of imprisonment. As discussed below, the court concluded that the purposes of a criminal sentence that are most important in this case are providing just punishment, specific deterrence, and reflecting the seriousness of the offense. The court also concluded that Criminal History Category II overstated the seriousness of the defendant's criminal history and expressed a concern about the cumulative effect of two enhancements, i.e. the enhancement for use of sophisticated means and the enhancement for causing the false registration of a domain name. Consequently, the court concluded that a non-Guidelines sentence was appropriate, and it

imposed a sentence that included a term of imprisonment of 78 months on each count, to be served concurrently.

The court's conclusion at sentencing that it was most important that the sentence provide just punishment, specifically deter the defendant from committing further offenses, and reflect the seriousness of the offense was based on the defendant's course of conduct in committing the charged offenses, and that course of conduct, together with the need to serve those purposes of sentencing, is what leads the court to conclude that the defendant's motion for compassionate release should be denied. Thus, it is appropriate to describe that course of conduct here.

The memorandum submitted by the government at the time of the defendant's sentencing accurately summarizes the defendant's actions that led to the three convictions:

> Between April and October 2013, O'Garro abused his position as President and Chief Executive Officer ("CEO") of Hybrid Insurance Agency, LLC ("Hybrid"), an insurance brokerage agency, to defraud a series of companies and entities with which Hybrid did business.
>
> There were three distinct but related aspects to the defendant's scheme. The first began with O'Garro's ill-advised decision to purchase a $995,000 beachfront condominium in the Dominican Republic on April 23, 2013. Pursuant to the purchase contract, the defendant was required to make a $100,000 installment payment on May 1, 2013. However, O'Garro did not have enough cash on hand to make the installment payment.
>
> To come up with the money, O'Garro submitted a series of fraudulent financing applications to Capital Premium Financing, Inc. ("CPF"), a family-run premium financing company based in Utah. The first application was submitted on April 30, 2013 – the day before the condominium payment was due. Through these applications, O'Garro falsely represented to CPF that: (1) AmTrust E&S Insurance Services, Inc. ("AmTrust"), an insurance carrier, had issued insurance policies for four companies; (2) these companies were using CPF's services to finance their premium payments; and (3) Hybrid had brokered the contracts and was entitled to collect the premiums on behalf of AmTrust. O'Garro had "binding authority" from AmTrust, a position of trust that allowed him to write policies on AmTrust's behalf without preapproval from AmTrust.
>
> O'Garro knew these representations were false. AmTrust had not issued insurance policies for any of the four companies, each of which was owned or operated, in whole or in part, by the defendant. Nevertheless, in reliance on the O'Garro's misrepresentations,

CPF released $849,282.55 in premium payments to Hybrid between May and early July 2013. O'Garro did not tell CPF that the policies were fraudulent; nor did he transmit the money to AmTrust (which would not even have known what to do with the money). Instead, O'Garro used the stolen money to pay for personal expenses (including paying $100,000 toward his condominium in the Dominican Republic) and to support Hybrid's sagging finances.

In mid-July 2013, a CPF officer, Chad Gabrielsen, asked O'Garro to connect him with someone at AmTrust who could independently verify the four policies. O'Garro attempted to cover up his fraud by directing his IT consultant to set up (1) a sham email domain (amtrustgrp.com) that was very similar to AmTrust's actual domain (amtrustgroup.com); and (2) an associated email account (regina.ricciuti@amtrustgrp.com) that was strikingly similar to the actual email account of an AmTrust underwriter, Regina Ricciuti, whom O'Garro knew from prior dealings with the company (regina.ricciuti@amtrustgroup.com). Then, on July 10, 2013, impersonating Ricciuti and using the regina.ricciuti@amtrustgrp.com email address that he controlled, O'Garro sent Gabrielsen a list of fake policy numbers and effective dates for the four nonexistent AmTrust policies. The email also listed a mobile telephone number for Ricciuti that, in fact, belonged to O'Garro. The effect was to make it appear to CPF that an AmTrust employee was confirming the nonexistent policies. However, if Gabrielsen (or anyone at CPF) had attempted to follow-up by sending an email to regina.ricciuti@amtrustgrp.com or by calling the mobile telephone number provided, the email or call would have gone to O'Garro.

CPF discovered the defendant's scheme when Gabrielsen called Ricciuti at her office telephone number and learned that she had not emailed him and that AmTrust had not issued the four policies in question. Shortly after that telephone call, O'Garro confessed his fraud to the CEO of CPF, David Gabrielsen (Chad's father). CPF subsequently placed a lien on O'Garro's home, and O'Garro agreed to make a partial repayment to CPF in the amount of $300,000. That financial obligation led to the second aspect of the defendant's crime.

In late June 2013, Hybrid was selected as the new wholesale broker for the City of Hartford's excess and umbrella insurance policies. The policies had an effective date of July 1, 2013, with the premiums due within 30 days to the carriers, Starr Indemnity & Liability Company, Inc. ("Starr Indemnity") and National Casualty Company ("National Casualty"). The premiums were supposed to be sent by the City to its retail agent, H.D. Segur, to pass along to Hybrid for remittal to the carriers. On July 18, 2013, however, O'Garro contacted the City's Treasurer directly (bypassing the City's retail agent) and falsely informed him that the City's premiums were late and that the City's coverage was in danger of cancelation.

In fact, the City's coverage was not in danger of cancelation, because the premiums were not due to the carriers until July 31, 2013. There was no contractual provision or understanding among the relevant parties that Hybrid had to receive the premiums prior to that date. But based on O'Garro's misrepresentations to the City

3

Treasurer, the City wired $868,244 in premiums to Hybrid on July 18, 2013. Of that sum, $441,900 constituted a premium payment owed by the City to Starr Indemnity and $228,097 constituted a premium payment owed by the City to National Casualty.[1] O'Garro did not remit the premiums to either Starr Indemnity or National Casualty. Instead, within 17 minutes of receiving the $868,244 wire from the City, O'Garro wired $300,000 to CPF to partially repay his fraud debt. In early September 2013, the City's Risk Manager questioned O'Garro about the status of Hybrid's payment to Starr Indemnity and National Casualty, and the defendant falsely assured him that the premium payments had been sent to the carriers.

      The third aspect of O'Garro's scheme targeted the State of Connecticut Department of Economic and Community Development ("DECD"). In the summer of 2013, at the same time O'Garro was defrauding CPF and the City's insurance carriers, he also applied for a $500,000 loan from DECD. The stated purpose of the loan was to expand Hybrid's business operations and create jobs in Connecticut. The loan application and supporting materials, which the defendant personally completed, required him to provide truthful information concerning his and Hybrid's financial condition. To increase the likelihood that the application would be approved, O'Garro provided false information to DECD, including by understating his and Hybrid's liabilities. O'Garro did not disclose, for instance, the premiums he stole from CPF, Starr Indemnity, and National Casualty, or premiums he owed to other insurance carriers (including $295,373 owed to AmTrust on actual insurance policies separate from the fraudulent policies discussed above, and $72,782.50 owed to Great American Insurance Company ("GAIC")). O'Garro also failed to disclose money owed to his employees, whose paychecks were bouncing that summer.

      Based on O'Garro's misrepresentations, DECD approved a $500,000 business development loan and mailed the defendant a check for the first $250,000 tranche of the loan on August 28, 2013. Instead of using the loan proceeds for business expansion, the defendant spent the taxpayer funds on personal expenses, including his Dominican Republic condominium ($25,000), his children's private school tuition ($19,000), and a loan to a friend ($6,000).

Gov't's Sentencing Mem. (ECF No. 125) at 1-6.

At sentencing the court explained why it concluded that there was a particular need for the sentence imposed to reflect the seriousness of the offense and to deter the defendant from committing further offenses, as follows:

      In terms of the seriousness of the offense, it seems to me noteworthy that your conduct had an impact on an industry that only functions well if people are able to act under the concept of binding authority, and your conduct created quite a concern, I think, for that industry.

---

[1] "The remaining $198,247 was passed along to a third insurance carrier with which the City had a contract."

4

> I also am struck by the impact that your offense conduct had on particular individuals who were here at trial.
>
> And finally, the impact on the city of Hartford was alluded to by counsel for the government.
>
> I think these are truly aggravating factors.
>
> In terms of specific deterrence, your counsel mentioned what I view as basically socioeconomic factors. I look at your character. In looking at your character as evidenced by your offense conduct, your motivation for the crimes, which was pure and simple greed to live a luxurious life-style at the expense of others, and your world view, which puts you at the center of things. And I won't read Paragraphs 71 and 72 of the Presentence Report, but I think they convey that point, not in the words I use, but they do support the conclusion that I reached.
>
> So I think there is a need to deter you from committing further offenses.

Trans. (ECF No. 142) at p. 37, ll. 11 to p. 38, ll. 10. The court alluded to and agreed with the government's explanation as to why the defendant's crimes were serious:

> By all measures, the defendant's crimes are serious. The total loss in this case is $2,137,433.05, and O'Garro's crimes affected at least six victims. The brazenness of the crimes, and the risks to which O'Garro exposed his victims, compound the severity of the harm. O'Garro jeopardized the City of Hartford's insurance coverage by diverting premiums meant for the carriers. He stole taxpayer dollars from DECD. He created and sent fraudulent policy documents to CPF for four companies that he owned or operated. He established a fake email account and impersonated an underwriter in an effort to hide his fraud from CPF. And he did it all to sustain a luxurious lifestyle he could not afford – while his employees' paychecks were bouncing. These circumstances demonstrate a complete disregard for the law, for societal norms and mores, and for other people.

Gov't's Sentencing Mem. (ECF No. 125) at 7.

The court must determine, after considering the factors set forth in section 3553(a) to the extent they are applicable, whether extraordinary and compelling reasons warrant a sentence reduction in the defendant's case and whether such a reduction is consistent with U.S.S.G. § 1B1.13, the applicable policy statement.

With respect to extraordinary reasons warranting a sentence reduction, the parties disagree about whether the defendant suffers from health conditions that make him particularly

susceptible to serious complications should he contract COVID-19.  The government's position with respect to the defendant's beta-thalassemia diagnosis is that although "the CDC has generically recognized thalassemia as a disorder that may (but does not necessarily) put people at higher risk for severe illness from COVID-19. . . . there are different kinds of thalassemia (alpha and beta), and different degrees of severity within those classifications. . . . [and] the defendant's medical records . . . are consistent with beta-Thalassemia minor", which "the medical literature indicates . . . is not of particular concern."  Gov't's Opposition (ECF No. 206) at 6.    With respect to the defendant's sleep apnea, the government's position is that the defendant has not established that he still suffers from it.  The defendant's position with respect to his beta-thalassemia diagnosis is, inter alia, that the sequence of events that led to him suffering a medical emergency which resulted in massive blood loss and blood transfusions upon his admission to Danbury Hospital and the evidence that he was scheduled for a consultation with a hematologist, which was cancelled due to the COVID-19 pandemic, taken together, demonstrate that his thalassemia condition is very serious.  With respect to the defendant's sleep apnea, the defendant's position is that his surgery alleviated some of his symptoms but he still suffers from this condition, and although he has requested a Continuous Positive Airway Pressure (CPAP) machine, to date he has not received it and experiences difficulty breathing throughout the night.  The court would need to obtain additional information to decide whether the defendant suffers from health conditions that make him particularly susceptible to serious complications should he contract COVID-19.  But the court concludes that resolving that question is not necessary because the defendant has not met his burden of demonstrating that, after considering the factors set forth in § 3553(a) to the extent they are applicable, there are compelling reasons that warrant a sentence reduction in his case.

After considering the applicable § 3553(a) factors, the court concludes that the defendant fails to present compelling reasons for reduction of his sentence.  At sentencing, as discussed above, the court concluded that it is most important that the sentence imposed not only constitute just punishment for the defendant's offense conduct, but also that it deter the defendant from committing further offenses and that it reflect the seriousness of the offense.  On May 12, 2016, the defendant self-surrendered and began serving his 78-month sentence.  The Bureau of Prisons website shows that the defendant currently has a release date of November 21, 2021.  Given this particular defendant's course of conduct during the commission of the offenses of conviction and this defendant's character, as discussed at sentencing, the court concludes that reducing his sentence to time served would seriously undermine the purposes of a criminal sentence the court concluded are most important in this case.  The court notes that in determining whether the defendant has demonstrated that there are compelling reasons that warrant a sentence reduction, nothing with respect to the number of COVID-19 cases at FCI Danbury and/or the way that the situation is being managed by that institution deserves greater weight than the objective of not undermining the purposes of a criminal sentence the court concluded are most important in this case.

It is so ordered.

Signed this 10th day of June 2020 at Hartford, Connecticut.

                                      /s/AWT\
                                Alvin W. Thompson\
                         United States District Judge